350 F.2d 67
 CAPITOL PACKING COMPANY, a corporation, and Meyer Averch, Appellants,
v.
UNITED STATES of America, Appellee.
Sol FELSEN et al., Appellants,
v.
UNITED STATES of America, and Orville E. Freeman, Secretary of Agriculture, Appellees.
 No. 7603.
 No. 7611.
 United States Court of Appeals Tenth Circuit.
 July 22, 1965.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED V. G. Seavy, Jr., Denver, Colo. (Anthony F. Zarlengo, Denver, Colo., with him on the brief), for appellants Capitol Packing Co. and Meyer Averch.
 William R. Koger and Robert E. Shelton, Oklahoma City, Okl. (David I. Shedroff, Denver, Colo., with them on the brief), for appellants Sol Felsen and others.
 Neil Brooks, Asst. Gen. Counsel, and Robert E. Duncan, Atty., Dept. of Agriculture, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., Alan S. Rosenthal, Atty., Dept. of Justice, and Robert E. Duncan, Atty., Dept. of Agriculture, Washington, D. C., with them on the brief), for appellee.
 Before MURRAH, Chief Judge, and PICKETT and SETH, Circuit Judges.
 SETH, Circuit Judge.
 
 
 1
 These are actions to review the decision of the Judicial Officer of the Department of Agriculture in adjudicatory proceedings brought under the Packers and Stockyards Act. These two cases were considered during the administrative proceedings as one, and the record, findings, and order here under review do not distinguish between them. The petitioners will be referred to as "appellants." The appellants were charged in the proceedings under different sections of the Packers and Stockyards Act of 1921 [7 U.S.C.A. §§ 181-231]. Capitol Packing Company is a "packer" under the Act. The individual, Meyer Averch, is a "registered dealer," and the individuals, Sol Felsen, Al Cooper, and Morey M. Miller (doing business as Farmers Livestock Commission Company) are "market agencies" under the Act.
 
 
 2
 The Judicial Officer found and concluded that appellants had engaged in practices which violated the Act and regulations adopted under it. The Officer issued cease and desist orders and suspended the individual appellants.
 
 
 3
 This opinion is separated in accordance with the issues presented in the two appeals from the same proceedings.
 
 
 4
 As to the appeal in Case No. 7603, a separate procedural issue was presented in the Government's motion to dismiss the appeal of Capitol Packing Company for failure to file it within thirty days after service of the order of the Judicial Officer. The Packers and Stockyards Act of 1921 [7 U.S.C.A. § 194(a)] provides that the order shall be final unless an appeal is filed within thirty days of its service on the packer. The Government contends this provision is applicable while the appellant urges that the Judicial Review Act of 1950, the Hobbs Act [5 U.S. C.A. § 1031 et seq.] provides that a party shall have 60 days in which to file an appeal. The question thus presented is which statute applies as both on their face purport to cover the packers' appeal.
 
 
 5
 The Government argues that by reason of certain amendments made in 1958 to § 204 of the Packers and Stockyards Act, the entire section including subsection (a) with which we are here concerned was still operative. This they argue makes the Hobbs Act ambiguous and subject to construction by use of its legislative history. We cannot agree with this argument. The Hobbs Act is the last Act of Congress on the subject, by its wording it clearly applies to the appeal in question, and there is no basis for resorting to its legislative history. The Hobbs Act governs the time for the packer to appeal, and under that Act the appeal here was timely.
 
 
 6
 Under the Packers and Stockyards Act, the responsibility for efficient regulation of market agencies and packers lies with the Secretary of Agriculture and the Judicial Officer acting in his stead. The proper scope of judicial review is limited to the correction of errors of law and to examination of the sufficiency of the evidence supporting the factual conclusions. Aikins v. United States, 282 F.2d 53 (10th Cir.); Hyatt v. United States, 276 F.2d 308 (10th Cir.). The findings and orders of the Judicial Officers must be sustained if not contrary to law and if supported by substantial evidence. The court is not to substitute its judgment for that of the Judicial Officer, as to which of various rational but opposed inferences should be drawn from the evidence. Aikins v. United States, supra; Hyatt v. United States, supra.
 
 
 7
 
 Case No. 7611 — Sol Felsen et al. v. United States.
 
 
 
 8
 Farmers Livestock Commission Company was at the time in question one of the two largest commission sellers of steers at the Denver stockyards. The individual appellants Felsen, Cooper, and Miller were partners doing business as Farmers Livestock Commission Company, a partnership, which was incorporated under the same name during the administrative proceedings. Appellants were charged with violating § 312(a) of the Act [7 U.S.C.A. § 213(a)], which makes it unlawful for any market agency "to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device" in connection with the marketing or selling of livestock. The partnership was a "market agency," as defined in the Act, as were the individuals named above as partners.
 
 
 9
 Upon review of the Hearing Examiner's report and after hearing oral argument, the Judicial Officer concluded that Farmers had engaged in unfair and unjustly discriminatory practices in violation of § 312(a) by reason of the following:
 
 
 10
 1. Failing or refusing to sell top loads of steers at the stockyards separately and on their merits;
 
 
 11
 2. "Ordering in" livestock for exclusive sale to Capitol Packing Company, Inc., the largest slaughterer of steers on the Denver market;
 
 
 12
 3. Lending some $51,000.00 to either Dave or Meyer Averch (the principal managing officers and shareholders of Capitol Packing Company), to Imperial Meat Company, Inc. (fifty per cent of which was owned at that time by the Averchs), or to D M & H Cattle Company (a subsidiary of Capitol, two-thirds of which is owned by the Averchs);
 
 
 13
 4. Undue and unreasonable preferences and advantages extended to Capitol Packing Company, Inc. in connection with marketing and selling cattle on a commission basis at the stockyard.
 
 
 14
 Farmers Livestock and the individual appellants were ordered to cease and desist from engaging in such practices, and they were all suspended as registrants under the Act for thirty days. The Original Decision and Order is at 22 Agr. Dec. 651, and the Decision and Order on Reconsideration is at 22 Agr.Dec. 1234.
 
 
 15
 
 1. Top Loads.
 
 
 
 16
 As stated above the Judicial Officer found a refusal on the part of the market agency to sell its better quality consignments separately from other consignments. The strongest evidence on this point is the affidavit of an official and buyer of Capitol Packing Company, one of the largest purchasers from Farmers Livestock Commission Company, and a party in the companion case, stating in part as follows:
 
 
 17
 "I attempt to buy in all alleys where there is livestock I can use. Some of the commission firms sell off the top loads to other packers. I won't buy in alleys where the top loads have been sold off. If I get first turn in an alley, I usually bid on all the cattle and will buy the whole alley if I can. I buy considerable cattle in Farmers alley because they have the kind of cattle I want, and I can buy the top cattle along with the other cattle."
 
 
 18
 This evidence is not refuted by appellants. Also Mr. Anton J. Plute, a buyer for another packer, testified he had encountered some trouble purchasing from Farmers, because he had wanted to pick top loads.
 
 
 19
 The Judicial Officer found this practice of the commission men to be a violation of § 302(a) of the Act and 9 C.F.R. 201.58 (22 Agr.Dec. at p. 678). 9 C.F.R. 201.58 requires sales of each consignment to the highest bidder without intermingling them, and not conditioned on sales of other consignments.[1]
 
 
 20
 The consent of the owner of the cattle consigned provides an exception in the regulation's prohibitions, but there is no evidence that Farmers obtained the owners' consent in refusing to sell off top loads. The practice by appellants is therefore in violation of the regulation and the Act.
 
 
 21
 The evidence supporting the Judicial Officer's finding that Farmers refused to so sell its top loads of steers separately is clear and uncontradicted.
 
 
 22
 
 2. Ordering In.
 
 
 
 23
 The complaint also charged Farmers with violating the Act by engaging in the practice of "ordering in" livestock from the country for delivery to packer buyers. This allegation contemplates that cattle were delivered to the stockyards prior to a sale to a packer for its acceptance or rejection and not presented for bidding as consigned cattle. In their answer to the complaint, the appellants admitted the practice of "ordering in," but they denied the existence of any option in the purchaser to reject the cattle "ordered in." This is a denial that the sale was not consummated before the cattle came to the stockyards.
 
 
 24
 The Judicial Officer found the practice of "ordering in" as described in the complaint and answer a violation of the Act, because the livestock is brought into a public market "with the appearance that it is for sale to the highest bidder under free and open competitive conditions," in violation of the commission firm's duty to get "the highest available price for livestock consigned to it rather than to reserve it for one packer." Farmers could not have breached any duties of a consignee of livestock in the "ordering in" process as described in the record since it shows the sales were complete before delivery to the yards. By definition a "consignment" is instead a delivery of cattle to be offered for sale. Acker v. United States, 12 F.Supp. 776 (N.D.Ill.), aff'd. 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257. There is also no evidence in the record that the livestock were brought to the stockyards "with the appearance it was for sale to the highest bidder." The record instead contains evidence to the effect that "ordered in" cattle are penned separately from consigned cattle so as not to give the impression they are for sale. Thus the cattle "ordered in" were not on consignment, did not appear to be such, and were apparently sold before arrival. The record does not support the findings as to this point. There is some problem with the definition of "ordering in," but the record does not show the practice followed by appellants to be as alleged in the complaint.
 
 
 25
 There is no regulation prohibiting "order buying," which basically is a sale before the arrival of the cattle at the yards, nor is there any evidence in the record tending to show it lessens competition. "Order buying" is impliedly sanctioned by the Secretary in that he has promulgated regulations governing the procedure. See, e. g., 9 C.F.R. 201.56 and 9 C.F.R. 201.62.
 
 
 26
 The process of "ordering in" when the sale is consummated in the country constitutes an arms' length transaction between the buyer and seller of steers, and in the absence of a specific regulation governing such details as to who is to pay the commission, it cannot be said that it is a violation of the Act for the shipper to pay the market agency's commission as was done here.
 
 
 27
 The Judicial Officer erred as a matter of law in concluding that "ordering in" practiced by appellants as described in the record is a violation of § 312(a) of the Act.
 
 
 28
 
 3. Loan to Shareholders of Capitol Packing Company.
 
 
 
 29
 In his findings of fact, the Judicial Officer found that on January 7 and February 11, 1957, Morey Miller, one of the individual appellants and a partner in Farmers Livestock Commission, loaned $25,000.00 and $26,000.00 respectively to D M & H Cattle Company for use in the construction of a meat processing plant for Imperial Meat Company, a separate corporation. Miller was found to have received a note from Imperial for $51,000.00. The Judicial Officer found that interest payments to Miller were made by D M & H and by Imperial. The loan was paid by Imperial on December 7, 1960. The only signatures on the note were those of two individuals, Dave and Meyer Averch, who control Capitol Packing Company. D M & H was a partnership with two-thirds ownership in the Averchs, and Imperial was a corporation, fifty per cent of which was owned by the Averchs.
 
 
 30
 Although diverse inferences might be drawn from the evidence relative to the loan, it would appear that the Judicial Officer's findings find sufficient support in the record. Aikins v. United States, 282 F.2d 53 (10th Cir.); Hyatt v. United States, 276 F.2d 308 (10th Cir.). From his findings, the Judicial Officer concluded the loan was a violation.[2] These conclusions would appear to be supported by the record, except insofar as they implicate Farmers Livestock Commission Company in addition to Miller as an individual. A review of the record reveals no evidence that Miller had any actual, apparent, or implied authority to act for Farmers Livestock Commission in this matter. He used his own capital and apparently acted, as stated in the Judicial Officer's conclusions, "in furtherance of his business relationship with such respondents." The record contains nothing to show the loan was made for or within the scope of his duties and functions with Farmers. Thus neither the evidence nor the findings of the Judicial Officer are sufficient to authorize sanctions against Farmers Livestock Commission nor against any individuals except Morey Miller. 9 C.F.R. 201.54 covers loans in connection with the services of a market agency, and this section would appear to set forth the duty breached by Miller in making the loan. As a registered market agency, as defined in 7 U.S.C.A. § 201(c), his registration was subject to suspension for such action. Cella v. United States, 208 F.2d 783 (7th Cir.).
 
 
 31
 
 4. Undue and Unreasonable Preferences to Capitol Packing Company.
 
 
 
 32
 The Judicial Officer concluded that Farmers had violated the Act by reason of undue preferences extended to Capitol Packing Company in connection with marketing and selling livestock on a commission basis. He examined the volume of livestock sold by Farmers to Capitol and found that during the six-month period between August 1, 1957, and January 31, 1958, Capitol purchased 37.7 per cent of all steers sold at the Denver Stockyards, and it purchased 63.1 per cent of all steers sold by Farmers. Farmers' stockyard sales during this period represented 21 per cent of all steer sales made at the yard, and the steers which it sold to Capitol accounted for 35 per cent of Capitol's total stockyard purchases. Finding 10, 22 Agr.Dec. at p. 658.
 
 
 33
 For the three month period between October 1 and December 31, 1958, the Judicial Officer found that Capitol purchased 51 per cent of all steers sold at the stockyard, and it purchased 72.4 per cent of all steers sold by Farmers at the yard. Farmers' sales during this period represented 25.8 per cent of all stockyard sales, and its sales to Capitol accounted for 36.6 per cent of Capitol's total purchases at the stockyard. Finding 11, 22 Agr.Dec. at p. 658.
 
 
 34
 The Judicial Officer's findings as to the volume of dealing between Farmers and Capitol are founded on several exhibits prepared by an auditor for the Department of Agriculture. In his findings, the Judicial Officer sets forth the statistics contained in these exhibits only as between Capitol and Farmers; however, when the marketing picture is examined as between Capitol and some of the other major commission firms, the statistics relied upon by the Judicial Officer seem to lose much of their significance. From an examination of all statistics, it would appear that Capitol purchased substantial numbers of cattle from other firms, that Farmers sold substantial numbers to other packers, and that the relative purchase-sale relationship between Farmers and Capitol was only slightly greater than was that of Capitol with at least two other commission firms. This slight difference might very well be due to the fact that during the two periods covered by the exhibits, Capitol was the largest purchaser and Farmers the largest seller of steers at the market. The buyer with the greatest demand would naturally turn to the source of greatest supply. Other possible explanations are not considered in the record. Capitol purchased a greater percentage of the steers available from each of the three commission agents represented than it did of the total market. No statistics were introduced to show the number of steers each commission agent had available for sale on a given day. In addition, there was no testimony to indicate that the six month and the three month periods provided accurate samples of the market. In fact, the auditor of the Government testified that the three month period was sufficient because it was a period of high receipts, thus indicating that it was not a representative period.
 
 
 35
 From the above, it must be concluded that by reason of the inconclusive nature of the statistics and the lack of proof that they represent an accurate sampling, they do not constitute sufficient evidence on which a finding or conclusion of favoritism or lack thereof could have been based.
 
 
 36
 In addition to the volume of sales, the Judicial Officer made certain findings as to the method of trading between Capitol and Farmers. He found that it was the practice of Miller to save or to hold consigned livestock for sale to Capitol. There is no evidence however to support such a finding. It was also found that when selling livestock to Capitol, Miller caused the livestock to be weighed later in the day than other livestock sold at the yard, thus allowing Capitol the advantage of natural weight shrinkage during the day. However there is no evidence in the record to show when in the day the sale was actually completed. He also found it to be Miller's practice to cause the price at which livestock had been sold to be omitted from the scale ticket by failing to inform the weightmaster of the price, as was customary in the stockyard. Both Government witnesses testified that the normal practice at the stockyard is that the price per hundredweight is inserted on the scale ticket at the time of weighing the livestock. However, they both stated that there was no regulation requiring such procedure. Thus this practice found to be followed by appellants cannot as a matter of law be a violation.
 
 
 37
 From this evidence on the several points, in addition to the specific violations previously discussed, the Judicial Officer concluded that Farmers had violated § 312(a) of the Act by extending unreasonable preferences to Capitol. 22 Agr.Dec. at p. 651. It is contended in effect by the Government that a collection of incidents suggesting preferences which are not unreasonable in themselves when combined with a large volume of business with the allegedly preferred party, and added to several unrelated specific violations, constitutes in itself a separate violation of § 312(a) of the Act.
 
 
 38
 The words, "unfair, unjustly discriminatory, or deceptive practice or device," as used in § 312(a) of the Act are not defined, and their meaning must be determined by the facts of each case within the purposes of the Packers and Stockyards Act. Swift & Co. v. Wallace, 105 F.2d 848 (7th Cir.); cf. Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325. However, specified methods of dealing which are not themselves violations of the Act cannot, when added together, become a violation. There is no penalty for "almost" violating the Act, and the diversity of ways and frequency with which one "almost" violates the Act do not constitute a violation. In order for a violation of § 312(a) to be committed, a specified manner of dealing must be found to be unfair or deceptive. United States v. Donahue Bros., Inc., 59 F.2d 1019 (8th Cir.). In choosing the words, "unfair, unjustly discriminatory, or deceptive practice or device," in § 312(a), specific methods of trade were contemplated and not a general course of dealing.
 
 
 39
 Thus the Judicial Officer was in error as a matter of law in holding that the total of several near violations constituted an undue or unreasonable preference in violation of the Act.
 
 
 40
 In addition to its attack on the substantive issues in the proceedings below, appellants raise several procedural issues, but we find no merit in them.
 
 
 41
 The appellants next contend that the orders of the Judicial Officer are invalid as to Farmers Livestock Commission Company, Inc., a corporation, or its officers, agents or employees, as such, since these defendants were not named in the original pleadings and were at no time joined as parties. The corporation came into existence after the date of the original complaint, but prior to the commencement of the first hearing on the proceedings. It succeeded to the business and assets of the partnership of the same name. It was not until the proceedings on reconsideration that the question of joining the corporate respondents and its officers, employees and agents arose. It is contended that to apply the cease and desist order to the corporation is contrary to 7 U.S.C.A. § 213 and 5 U.S.C.A. § 1006, which require notice and hearing, and does not satisfy the minimum requirements of administrative due process.
 
 
 42
 In his Decision and Order on Reconsideration, the Judicial Officer stated as to this point that there was no showing of the reason for incorporation after service of the complaint, and instead only an assertion that the corporation had not violated the Act. He also found that the ownership of the partnership and the corporation was essentially the same.
 
 
 43
 If incorporation had taken place before the commencement of the proceedings below, the corporation would be responsible for the acts of the partnership to which it succeeded, on the authority of N. L. R. B. v. Fred P. Weissman Co., 170 F.2d 952 (6th Cir.), and of N. L. R. B. v. Colten, 105 F.2d 179 (6th Cir.). Likewise, if incorporation took place after the termination of these proceedings, the successor would be bound by the administrative orders. Regal Knitwear Co. v. N. L. R. B., 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661. It would seem strange, indeed, then, that a corporation would not succeed to liability for the acts of the partnership if it is incorporated during the course of the proceedings.
 
 
 44
 The complainant intended to and did serve Farmers Livestock Commission Company, or the individuals doing business under that name. It is equally clear that this is the only commission firm at the Denver stockyards doing business under that name. In the original proceedings the individuals doing business as Farmers Livestock Commission Company appeared and were represented by counsel. The record shows that they continued to appear and be represented in such capacity after the company was incorporated. Under the Packers and Stockyards Act, upon termination of the proceedings before the Judicial Officer and within fifteen days after the date of the service of the order, an aggrieved party may file a petition for reconsideration, as was done in the instant proceeding. 9 C.F.R. 202.22(3). This was apparently the first time that the Judicial Officer's attention had been called to the fact of incorporation. Since the petition was presented before the Judicial Officer's order became final, and since the individuals doing business as Farmers Livestock Commission Company were actually served and appeared yet did not see fit to call the fact of incorporation to the attention of the Judicial Officer, the corporation was not prejudiced, and this error in nomenclature was an irregularity which was not fatal.
 
 
 45
 Finally, the appellants contend that the registrations of Sol Felsen, Al Cooper, Morey Miller, and of the Farmers Livestock Commission Company and of Farmers Livestock Commission Company, Inc., being forms of license under 5 U.S.C.A. § 1002, are subject to § 9(b) of the Administrative Procedure Act [5 U.S.C.A. § 1008(b)], and cannot be suspended except for a wilful violation.[3] The respondents contend that these requirements have not been satisfied and the registration of the appellants therefore cannot be suspended.
 
 
 46
 There is no contention that 5 U.S.C.A. § 1008(b) is not applicable or that the written notice provisions thereunder were satisfied in this proceeding. There is no specific finding of wilfulness by the Judicial Officer. Therefore, for the suspension to be sustained, it must be shown by the facts found by the Judicial Officer that the violation was wilful.
 
 
 47
 To demonstrate that the appellants wilfully violated the Packers and Stockyards Act, the Government in its argument relies on two stipulations entered into in 1947 and 1954 by Sol Felsen, Al Cooper, Harry Hoyt, and Morey Miller, doing business as Farmers Livestock Commission Company, in which the registrants admit numerous violations of the Act and agree to cease and desist from further violations. However, none of the violations which the registrants admitted at that time were charged in this action.
 
 
 48
 Next the Government argues that wilfulness is shown because the petitioners intentionally committed a prohibited act, citing Goodman v. Benson, 286 F.2d 896 (7th Cir.), that:
 
 
 49
 "We hold the petitioner's conduct was wilful within the meaning of section 9(b) of the Administrative Procedure Act. We think it clear that if a person 1) intentionally does an act which is prohibited, — irrespective of evil motive or reliance on erroneous advice, or 2) acts with careless disregard of statutory requirements, the violation is wilful."
 
 
 50
 The court in the cited case found however that the defendant's violations constituted clear violations of the Act and that he was not acting in good faith. The remainder of the cases cited by the Government in support of its interpretation also show a gross disregard of the law. For example, in Eastern Produce Co. v. Benson, 278 F.2d 606 (3d Cir.), the court made a finding that the defendant's actions constituted "notorious neglect of explicit provisions of law"; in Great Western Food Distributors v. Brannan, 201 F.2d 476 (7th Cir.), cert. den. 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404, the defendant had attempted to corner the egg market; in Air Transport Associates v. Civil Aeronautics Board, 91 U.S.App.D.C. 147, 199 F.2d 181 (D.C. Cir.), cert. den. 344 U.S. 922, 73 S.Ct. 386, 97 L.Ed. 710, the court found written warnings from enforcement officers and the defendant's replies sufficient to show wilfulness. Schwebel v. Orrick, 153 F.Supp. 701 (D.C.C.), aff'd. on other grounds 102 U.S.App.D.C. 210, 251 F.2d 919 (D.C.Cir.), contains statements on the issue which are not persuasive because the court found compliance with the written notice requirements of § 9 (b).
 
 
 51
 An examination of the cases cited above leads one to the conclusion that they support the interpretation of "wilfulness" contended for by appellants, that is, an intentional misdeed or such gross neglect of a known duty as to be the equivalent thereof. This interpretation receives support from the legislative history of the Administrative Procedure Act. As stated in the House Report on the Act, in discussing § 9(b):
 
 
 52
 "The exceptions to the second sentence, regarding revocations, apply only when the demonstrable facts fully and fairly warrant their application. Wilfulness must be manifest." H.R.Rep.No.1980, 79th Cong., 2d Sess. 41 (1946).
 
 
 53
 See also, S.Rep.No.752, 79th Cong., 1st Sess. 25 (1945), 92 Cong.Rec. 5654 (remarks of Congressman Walter).
 
 
 54
 However, even under the appellant's definition of "wilfulness," it would appear that the refusal to sell off top loads was a wilful violation of the Act and regulations thereunder since it was in disregard of a specific regulation.
 
 
 55
 As to No. 7611, we hold that the decision of the Judicial Officer was correct in that the refusal by Farmers to sell top loads was a violation, and it was a wilful one. Further, we hold that the loan of money to the shareholders of Capitol Packing Company was a violation by the individual, Morey Miller, but not a violation by Farmers. There were no other violations by the individual appellants nor the partnership or corporation in Case No. 7611 supported by sufficient evidence appearing in the record.
 
 
 56
 
 Case No. 7603 — Capitol Packing Company and Meyer Averch v. United States of America.
 
 
 
 57
 This matter was considered in the administrative proceedings together with No. 7611 above, and the Decisions and Orders of the Judicial Officer of the Department treat the two as one proceeding. (22 Agr.Dec. 651; 22 Agr.Dec. 1234).
 
 
 58
 These appellants, a packing company and one of its officers who was its principal buyer of cattle and who is a "registered dealer" under the Act, were charged with violations of § 202 of the Packers and Stockyards Act [7 U.S.C.A. § 192], which prohibits among other things a packer from giving an undue or unreasonable preference to any particular person.[4] In addition, the appellant, Meyer Averch, was charged with violating § 312 (a) [7 U.S.C.A. § 213], which was considered in Case No. 7611 above.
 
 
 59
 The Judicial Officer found that the Capitol Packing Company had violated § 202 and appellant, Meyer Averch, had violated § 312(a) by:
 
 
 60
 1. Deducting a "yardage" charge from the price paid for livestock shipped directly from the country to the packer when no yard services were in fact furnished for such steers for the account of the seller;
 
 
 61
 2. Borrowing $51,000.00 from Morey Miller (a "market agency");
 
 
 62
 3. Refusing without reasonable cause to transact business with the Denver Livestock Commission Company, a commission agent operating in the Denver Union Stockyards;
 
 
 63
 4. Extending preference or advantage to Farmers Livestock Commission Company in connection with the purchase of steers in commerce.
 
 
 64
 Capitol Packing Company and Meyer Averch were ordered to cease and desist from engaging in such practices, and in addition, Meyer Averch was suspended for thirty days as a registered dealer under the Act. 22 Agr.Dec. at pp. 1246-47.
 
 
 65
 The appellants' sole contention is that the charges against them as sustained by the Judicial Officer are without foundation in fact and wholly unsupported by the evidence.
 
 
 Deduction of Yardage:
 
 
 66
 As to the charge that Capitol deducted "yardage" from the price of direct purchased livestock when no services were in fact performed at the yards, the Judicial Officer found that the deduction was apparently equal to the amount of money the sellers would have had to pay as yardage charges if they had marketed their livestock at the yard, and that Capitol in turn paid this amount monthly to the stockyard company. Furthermore, he found that the deduction was in effect a charge to the country seller of livestock for a service which he did not obtain, and it bore no relationship to the value of the cattle for slaughter purposes to Capitol. From these findings he concluded that the practice is "unfair" within the meaning of 7 U.S.C.A. § 192(a) and that consent by the shippers to such deductions from the purchase price does not validate the deductions. Finding 32, 22 Agr.Dec. at p. 668, and 22 Agr.Dec. at p. 691.
 
 
 67
 The record shows that Capitol had a contract with the Denver Union Stockyards whereby it was agreed that Capitol would pay yardage fees on cattle slaughtered although purchased in the country and not delivered to the stockyards but directly to the packing house. The record shows that this yardage was collected from the country sellers and paid to the stockyards company.
 
 
 68
 There is no evidence that such practice was deceptive or that any sellers were subjected to unreasonable prejudice or disadvantage. The problem is similar to that presented in Wilmington Provision Co. v. Wallace, 72 F.2d 989 (3d Cir.), although the payment was in another direction. There the evidence established that in selling to A & P the packer would add a brokerage fee to the gross amount invoiced, and it would upon payment remit the fee to A & P's broker. The court held that since the evidence showed A & P received no price advantage the charge could not stand as a matter of law. The same principle applies here and we hold as a matter of law that this practice did not constitute a violation of the Act.
 
 
 Loan to Capitol from Morey Miller:
 
 
 69
 The evidence and law with respect to the alleged $51,000.00 loan from Morey Miller to Capitol's shareholders is discussed in Case No. 7611, pp. 74, 75. There is no reason why the result should be any different under 7 U.S.C.A. § 192 than it is under 7 U.S. C.A. § 213. The borrowing of money with the payment of interest to Miller can well be considered to be an undue preference, and the Judicial Officer so found.
 
 
 70
 
 Unreasonable Refusal to Purchase From a Market Agency ("Drydocking").
 
 
 
 71
 The Judicial Officer found that prior to June 23, 1959, Capitol purchased livestock at the stockyard from all commission firms, but that shortly prior to this date and from June 23 through August 11, 1959, Capitol did not purchase any livestock from Denver Livestock Commission Company, Inc. or even attempt to do so. Finding 18, 22 Agr.Dec. at 662-4. It was testified that a salesman for Capitol told one of the commission company owners that he had been instructed not to buy any livestock from the Denver Livestock Commission Company.
 
 
 72
 From the above contradictory evidence, there is a sufficient basis for the Judicial Officer's conclusion that during the seven week period Capitol refused to buy from Denver Livestock. However, as the Judicial Officer himself stated, in order to violate the Act in this case, such refusal must be without reasonable cause. The record also contains sufficient evidence upon which the Judicial Officer could base his finding that this refusal to buy was without reasonable cause. We might not agree with this finding or draw different inferences from the facts, but we cannot say that it was unreasonable nor unsupported by substantial evidence. Aikins v. United States, 282 F.2d 53 (10th Cir.); Hyatt v. United States, 276 F.2d 308 (10th Cir.).
 
 
 Preferences:
 
 
 73
 Regarding his ultimate conclusion that the respondent had violated the Act by extending preferences or advantages to Farmers Livestock Commission Company in connection with the purchase of steers in commerce, the Judicial Officer made subsidiary findings and conclusions.[5]
 
 
 74
 The volume of dealings at the stockyards between Farmers and Capitol has previously been considered in Case No. 7611. Prior to September 2, 1958, 7 U.S.C.A. § 213(a) confined violations by dealers and market agencies to occurrences "at the stockyards." However, 7 U.S.C.A. § 192 defines violations by packers as matters occurring "in commerce." Therefore, the volume of dealings between Capitol and Farmers in the country (direct buying without the delivery of the cattle to the stockyards) may properly be considered.
 
 
 75
 The Judicial Officer found that during the six month period from August 1, 1957, through January 31, 1958, Capitol purchased a total of 27,500 cattle through Farmers (7,284 at the yards and 20,216 directly), or 39.3 per cent of its total supply of steers for slaughter. (Capitol's total purchases during the period were 69,952. Of these, 20,747 were purchased at the yard and 49,205 were acquired directly). Capitol's purchases from all other commission firms during the period amounted to 23.5 per cent of its total purchases. Capitol acquired 37.2 per cent of its cattle, or 26,048 steers, directly from feeders without the services of a market agency. Finding 9, 22 Agr.Dec. at p. 657; 22 Agr.Dec. at pp. 669-70. In 1958 Farmers sold 42,038 steers at country points, 41,327 or 98.3 per cent of which were sold to Capitol. The Judicial Officer found from this volume that:
 
 
 76
 "The ultimate relationship between these two respondents is clearly shown by Farmers' sales of livestock from country feed lots directly to Capitol * * * These statistics indicate that on sales of country livestock Farmers was tantamount to a supply or procurement agency for Capitol." 22 Agr.Dec. at p. 670.
 
 
 77
 The Judicial Officer's conclusions as to the volume of dealings between Farmers and Capitol are based on incomplete data and without evidence of proper sampling as discussed in No. 7611. There is again no reason given for selection of the periods chosen for study. It may be assumed that the volume of cattle trading varies throughout a year, and there is some testimony in the record that trading patterns between individual packers and market agencies vary to a great extent over a period of time. The statistics are not complete in that there are no figures showing the number of cattle handled by the various commission firms by means of direct purchase. During 1958 Capitol purchased 98.3 per cent of the direct sales of cattle by Farmers. Of the direct purchases it handled through commission firms during the six months' period, Capitol channeled 87.3 per cent through Farmers. However, the Judicial Officer failed to note that during this six months' period Capitol purchased 78.8 per cent of all cattle purchased directly by the nine major packers, according to the statistics in Exhibit 11 (direct purchases by Capitol during this period totaled 49,205, while the total direct purchases of all nine major packers totaled 62.413). According to these latter figures Capitol acquired only 41 per cent of its direct purchase needs through Farmers.
 
 
 78
 From the above, it might seem that one should conclude that Capitol supplied itself from all available sources in connection with its direct purchases, but that none of them alone was sufficient to satisfy its needs. However, because of the incomplete nature of the statistics and the lack of foundation to support them as an accurate sampling of the marketing picture, it would seem that no valid inference at all as to favoritism or lack thereof can be drawn, and the Judicial Officer's conclusions with respect to them are not supported by evidence.
 
 
 79
 The dealings between Capitol Packing Company and Farmers Livestock Commission Company with regard to cattle of a feeder known as D M & H was considered separately by the Judicial Officer. He concluded that Capitol preferred Farmers in these dealings in violation of the Act.
 
 
 80
 The record shows that during January, February, and March 1958, Capitol paid commissions to Farmers on cattle which it brought in for slaughter from D M & H feedlot. There is no question that D M & H operates as a source of supply for Capitol. It supplies about 20,000 cattle a year to Capitol. Two-thirds of the ownership of the two enterprises is common, and one-third of D M & H is owned by a person with no ownership in Capitol. The record shows that Farmers purchased feeder cattle for D M & H to go to its feedlot, and these cattle when finished were then sold to Capitol. For its services Farmers received a commission when these cattle were purchased for feeding and when sold for slaughter. This was in accordance with an agreement among the parties concerned. There is insufficient evidence to support the Judicial Officer's conclusion that Capitol unreasonably preferred Farmers in the latter's dealings with D M & H cattle.
 
 
 Bonus Prices:
 
 
 81
 The sole evidence supporting the Judicial Officer's finding that Capitol at times paid more than necessary for livestock in purchases of cattle from Farmers is contained in an affidavit of Morey Miller, where it is stated:
 
 
 82
 "Meyer will at times help me out when I have to get a little more on a shipper's cattle in order to get them to come in here."
 
 
 83
 There is no evidence in the record to show that this was not done for others, nor does it by reason of its equivocal nature show that payment is above the prevailing market price nor otherwise is a preference. There is no substantial evidence on this point to support the Judicial Officer's finding.
 
 
 Advance Information by Capitol to Farmers:
 
 
 84
 There is no conflict in the evidence as to the Judicial Officer's finding that Capitol would give advance buying information of some sort to Farmers before the market opened in the morning, and that it would supply information as to grade and yield on cattle which Farmers sold to Capitol. As stated in Morey Miller's affidavit: "Lots of times Meyer Averich [sic] will come by my alley about the time the market opens and he will give me an `inkling' as to what he will do that day." There was also other evidence on this point, however no evidence to show that these practices constitute a "preference" much less an "unreasonable preference" or that they are "unfair." The record contains evidence which would indicate that Capitol was not alone, at least in giving information as to grade and yield. There is no evidence in the record which indicates that Capitol refused this information to others or that the bare dissemination of such information violates the Act.
 
 
 85
 
 Cleaning Up Farmers' Pens (Buying All Consigned Cattle on Hand).
 
 
 
 86
 Again, the evidence is unequivocal on the question of Capitol's practice of "cleaning up" Farmers' pens. There is substantial evidence that Capitol would frequently buy all of Farmers' cattle on hand. However, there is once again no evidence that it was not done for all nor that this practice constitutes a preference under the statute.
 
 
 General Conclusions by Judicial Officer:
 
 The Judicial Officer concluded:
 
 87
 "It is patent from the recital of the dealings between the market agency respondent Capitol set forth in the Findings of Fact and described above that Capitol made or gave the respondent commission firm preference or advantage over other commission firms in its acquisition of livestock * * *. Such conclusion * * * is based, for example, upon the volume of dealings through Farmers as compared with other commission firms, the payment of `selling' commissions on D M & H livestock when no selling services were performed, informing Farmers of its requirements on the stockyard before the market opened, `cleaning up' Farmers' alleys and giving Farmers more for livestock in order to induce the producer thereof to ship livestock to Farmers for sale on a commission basis." 22 Agr.Dec. at p. 675.
 
 
 88
 Since it would appear that the incidents enumerated in the above quotation are either not established by the record or do not in themselves constitute a violation of the Packers and Stockyards Act, we are faced with the same problem raised and discussed in Case No. 7611. This is whether a collection of incidents which do not in themselves indicate preferences which are unreasonable, when combined with a marketing picture revealing a large volume of business between the respondent and the allegedly preferred party, and several specific violations can total a separate violation of the Packers and Stockyards Act. Although we are here concerned with a different section of the Act, no reason appears why the reasons stated in Case No. 7611 would not apply here. Specific methods of trading were contemplated by the Act, and not merely a general course of dealing. Thus the Judicial Officer's conclusion must fail.
 
 
 89
 The suspension of Meyer Averch as a registered "dealer" under the Act raises some additional problems. Capitol was charged with violations of 7 U.S. C.A. § 192 which is applicable to "any packer or any live poultry dealer or handler" and violations are defined as acts which occur "in commerce." Meyer Averch, on the other hand, was charged with violations of 7 U.S.C.A. § 213, as was Farmers, which applies to "any stockyard owner, market agency, or dealer." Subsequent to September 2, 1958, violations under this section are defined as acts which occur "in commerce." However, prior to this date they are limited to acts "at a stockyard." The Judicial Officer found that:
 
 
 90
 "Meyer Averch, a registered packer-buyer and dealer subject to Section 312(a) [7 U.S.C.A. § 213(a)] of the Act was the head steer buyer for Capitol at the stockyard and the agency or means through which Capitol thus extended undue and unreasonable preferences and advantage to Farmers, as set forth above. Consequently, Meyer Averch violated such Section by reason thereof." 22 Agr.Dec. at p. 680.
 
 
 91
 However, Meyer was joined with Capitol in the cease and desist order and ordered to cease and desist doing certain acts "in commerce." 22 Agr.Dec. at pp. 1246-47. The order cannot however be applied to him because it is partially based on transactions which took place before September 2, 1958. For example, part of the data concerning concentration of purchases in the country between Capitol and Farmers relates to the period before September 2, 1958, as does the evidence relative to the charge that Capitol paid commissions to Farmers on cattle purchased from D M & H when no service was performed, and the evidence relating to the deduction of yardage on country purchases. In fact, this latter practice does not constitute a preference at all, but was found "unfair" by the Judicial Officer. Since the evidence is not separated, it cannot be found that there is sufficient evidence to support the order suspending him as a registered "dealer" under the Act.
 
 
 92
 We hold that there is sufficient evidence to support the Judicial Officer's findings in Case No. 7603 that the acceptance of a loan from Morey Miller by the appellant corporation or its shareholders constituted a violation as did the corporation's refusal to deal (drydocking) with the Denver Livestock Commission Company. We find no evidence to support other violations by the corporation. As to the individual appellant, the cease and desist order relating to acts performed "in commerce" cannot be applied to him because it is based in part on incidents which took place outside the stockyards prior to the amendment of the statute to include such transactions.
 
 
 93
 The orders and decisions here reviewed are set aside, and the cases are remanded to the Department for such further proceedings as the appropriate officers consider necessary.
 
 
 
 Notes:
 
 
 [1]
 "Every market agency and licensee engaged in the business of selling livestock or live poultry on a commission or agency basis shall offer the livestock or live poultry consigned to it for sale on the open market and shall sell such livestock or live poultry at the highest available bid. * * * A market agency or licensee shall not make the sale of one consignment of livestock or live poultry conditional on the sale of another and different consignment of livestock or live poultry without the consent of the owners."
 
 
 [2]
 "We can only surmise from the record herein, that is, from the evasions and contradictions of the persons connected with the loan and the note, that the officers of Capitol and the partners of Farmers were aware or were of the opinion that such loan was improper. Also we believe the record indicates that the $51,000 loan was, in reality, made to the Averch respondents in furtherance of his business relationship with such respondents as alleged in the Complaint * * * [I]t is clear that even if the loan is considered as having been made to Imperial the loan was secured basically by the personal credit of Meyer and Dave Averch for the benefit of a business enterprise in which they were substantially interested as officers and stockholders." 22 Agr.Dec. at p. 674
 
 
 [3]
 "Except in cases of willfulness or those in which public health, interest or safety requires otherwise, no withdrawal, suspension, revocation, or annulment of any license shall be lawful unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements."
 
 
 [4]
 7 U.S.C.A. § 192 provides in part:
 "It shall be unlawful with respect to livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products for any packer or any live poultry dealer or handler to:
 "(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce; or
 "(b) Make or give, in commerce, any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject, in commerce, any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever * * *."
 
 
 [5]
 The Judicial Officer made the following subsidiary findings and conclusions:
 "Naturally, Capitol, being by far the largest slaughterer of steers in the Denver trade territory, would purchase steers from respondent Farmers * * * We believe, however, that the record shows more than the mere purchase and sale of livestock between a large buyer and seller. In fact, the extent of the dealings between these two respondents and the special and unusual arrangements between them lead to the conclusion that their relationship was different from that between Capitol and other market operators * * * and was not one that should be expected, and in fact required, from a fiduciary and the purchaser of his principal's livestock." 22 Agr.Dec. at p. 669.