**HUTTO STOCKYARD, INC.; John D. Hutto; Charles L. Hutto, Petitioners,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.**

No. 89–2717.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 11, 1990.

Decided May 9, 1990.

---

Karen J. Williams, Williams & Williams, Orangeburg, S.C., for petitioners.

Ellen Ruth Hornstein, Office of the Gen. Counsel, U.S. Dept. of Agriculture, Washington, D.C., for respondent.

C. Bradley Hutto, Charles H. Williams, Williams & Williams, Orangeburg, S.C., on brief, for petitioners.

James Michael Kelly, Associate Gen. Counsel, Raymond W. Fullerton, Asst. Gen. Counsel, Margaret M. Breinholt, Deputy Asst. Gen. Counsel, U.S. Dept. of Agriculture, Washington, D.C., for respondent.

Before POWELL, Associate Justice (Retired), Supreme Court, sitting by designation, and CHAPMAN and WILKINS, Circuit Judges.

WILKINS, Circuit Judge:

Hutto Stockyard, Inc., John D. Hutto, and Charles L. Hutto (collectively Hutto) petition for review of the decision of a Judicial Officer for the United States Department of Agriculture (USDA) that Hutto violated statutory and regulatory provisions of the Packers and Stockyards Act (Act), 7 U.S.C.A. §§ 181 *et seq.* (West 1980 & Supp.1990). The Judicial Officer (JO), adopting the order of the Administrative Law Judge (ALJ) as the final order of the Secretary, suspended Hutto as a registrant under the Act for 90 days,[1] fined it $20,000, and ordered it to cease and desist from violating the Act. Hutto contends that USDA failed to comply with the Administrative Procedures Act (APA) and that USDA deprived it of due process. In addition, Hutto contends that the decision of the Secretary is not supported by substantial evidence and that the monetary penalty imposed is excessive. We affirm in part, reverse in part, vacate in part, and remand.

I.

Hutto Stockyard, Inc., operates a livestock market in Holly Hill, South Carolina, and a hog buying station in Manning, South Carolina. Charles Hutto and his son operate the Manning buying station at which they essentially serve as middlemen for farmers selling hogs. Hogs are weighed at the station, purchased for an amount based on the hogs' weight, and re-sold to packers for an amount based on this same weight for a few cents more per pound.

---

1. This order prohibits Hutto Stockyard from operating its business at all locations for the entire suspension period.

In April 1987, Packers and Stockyards Administration representatives David Auten and Ben Baird conducted a "sting" operation to investigate the weighing practices at Hutto's Manning buying station. After weighing 13 hogs on a scale in their truck, Auten and Baird transported them to Manning where they reweighed six of the hogs and recorded the weights. Impersonating a farmer, Auten then transported these six hogs to Hutto's buying station where he offered to sell them.

Hutto's weighmaster weighed Auten's six hogs in three drafts: two of the hogs were weighed individually, and four were weighed together. As the following chart illustrates, the weights of the hogs as determined by the weighmaster were less than the weights earlier determined by Auten and Baird:

| Draft No. | No. of Hogs | USDA Weight | Hutto Weight | Discrepancy In Pounds |
|---|---|---|---|---|
| 1 | 1 | 401 | 390 | 11 |
| 2 | 4 | 813 | 795 | 18 |
| 3 | 1 | 176 | 165 | 11 |

After receiving payment for the hogs, Auten left the buying station to join Baird who had remained a short distance away. The two men then reweighed the second group of seven hogs on their scale and drove back to the buying station where the weighmaster weighed the hogs in two drafts: six together and one individually. Again, there were discrepancies between the weights determined by the weighmaster and the weights earlier determined by Auten and Baird:

| Draft No. | No. of Hogs | USDA Weight | Hutto Weight | Discrepancy In Pounds |
|---|---|---|---|---|
| 4 | 6 | 1412 | 1390 | 22 |
| 5 | 1 | 204 | 200 | 4 |

Auten testified that he observed the weighmaster insert the scale ticket in the poise [2] before weighing the hogs. Auten further testified that the weighmaster was closing the trig loop latch when the indicator needle was above rather than in the target area of the Spinks indicator. He also testified that the weighmaster was not balancing the scale every 15 minutes or 15 weighing drafts, whichever came first. Additionally, according to Auten's testimony, after the hogs were weighed, the weighmaster gave him the scale tickets and a check in payment for the hogs. The scale tickets did not show the date of weighing or the weighmaster's initials or name, and were imprinted with the location of the Holly Hill livestock market rather than the Manning buying station.

According to Auten and Baird, three mechanical factors contributed to the short-weighing. First, the scale was "back-balanced" by two pounds, causing it to weigh two pounds light. Back-balancing results when the scale is balanced while accumulated debris (such as manure) remains on

2. The Hutto Stockyard scale weighs in five-pound increments. Although larger in size, it is similar in design to a physician's scale. The weight is ascertained by sliding the "poise" along the horizontal main bar until it reaches the proper 100-pound increment. The "knurl" on the poise is then turned to the nearest five-pound increment. Then, when the needle on the "Spinks indicator" settles in the target area, the trig loop latch is closed, the scale ticket is inserted in the poise, and the printing handles are squeezed (printing the weight on the scale ticket). If the trig loop latch is closed by the weighmaster when the indicator needle is above rather than in the target area, the printed weight will be artificially low. Likewise, if the latch is closed when the indicator needle is below rather than in the target area, the printed weight will be artificially high.

the scale. Second, inserting the scale ticket in the poise before the scale registered the hogs' weight caused the scale to weigh an additional two pounds light. Finally, Auten and Baird disassembled the poise and inside found a dead mouse, straw, and acorns.[3] Auten and Baird stated that the dead mouse caused the scale to short-weigh by up to nine pounds.

USDA charged Hutto with falsely weighing livestock in violation of 7 U.S.C.A. § 213(a) (West 1980) which, *inter alia*, prohibits stockyard operators from using "any unfair ... or deceptive practice or device in connection with ... [the] weighing ... of livestock." [4] USDA contends that Hutto caused the false weighing by:

(1) failing to balance the empty scale every 15 minutes or 15 drafts, whichever came first, 9 C.F.R. § 201.73–1(a)(1) (1989);

(2) back-balancing the scale, *id.;*

(3) closing the trig loop latch when the indicator needle was above rather than in the target area, 9 C.F.R. § 201.73–1(b)(1)(i) (1989);

(4) inserting the scale ticket in the poise before weighing, 9 C.F.R. § 201.73–1(g)(1) (1989); and

(5) allowing material (the mouse and its nest) to accumulate in the poise, *id.*

In addition, USDA alleged that Hutto violated 7 U.S.C.A. § 221 (West Supp.1990) by issuing improperly completed scale tickets.[5]

The ALJ found that Hutto had committed the alleged violations, albeit without bad motive or intent. Hutto appealed the decision of the ALJ to the JO. The JO adopted the ALJ's decision as the final order, but "inferred" from the record that Hutto had a financial motive to falsely weigh and that it willfully violated the Act.

## II.

Hutto contends that the decision of the Secretary that it falsely weighed hogs is not supported by substantial evidence. At the administrative hearing before the ALJ, Hutto presented extensive evidence disputing the allegation of false weighing. It argued that the discrepancy between the weights obtained by Auten and Baird and those of the weighmaster could be accounted for by considering (1) the three mechanical factors relating to the scale (back-balancing, prematurely inserting the scale ticket in the poise, and the dead mouse in the poise), (2) the fact that the USDA scale weighed in one-pound intervals and Hutto's scale weighed in five-pound intervals, and (3) the "shrinkage" (weight loss due to perspiration, urination, defecation, and tissue loss) of the hogs between the time of USDA and Hutto weighings, as established by expert veterinary testimony. Hutto contends that once these factors are considered, no discrepancy between the USDA and Hutto weights remains, and thus no evidence exists to support the ALJ's finding of a violation of section 213(a). Moreover, the weighmaster testified that he periodically balanced the scale and that there was no evidence that the back-balancing was caused by anything other than the accumulation of debris resulting from the continuous weighing of hogs that morning. Hutto also offered the testimony of two sellers that the weighmaster closed the trig loop latch when the indicator needle was in the target area. Our review of the record demonstrates that Hutto offered a plethora of evidence which would fully support a finding in its favor.

However, the ALJ essentially rejected all of the testimony offered by and on behalf

---

**3.** The South Carolina Department of Agriculture had conducted its biannual inspection of the scale a week earlier and found it to be in proper operating condition. The poise is the most delicate part of the scale and is enclosed within a metal box. USDA regulations prohibit weighers from adding material to or otherwise tampering with the poise. 9 C.F.R. § 201.73–1(g)(1) (1989). Moreover, when a weigher, such as Hutto, "has reason to believe that a scale is not functioning properly" he may not repair the scale but "shall discontinue weighing, report the facts to the parties responsible for scale maintenance, and request inspection, test, or repair of the scale." 9 C.F.R. § 201.73–1(g)(4).

**4.** Violation of section 213(a) carries a maximum fine of $10,000. 7 U.S.C.A. § 213(b).

**5.** Violation of section 221 carries a maximum fine of $5,000.

of Hutto and accepted all of the testimony offered by the government witnesses. Since we may not assess and pass on the credibility of witnesses, we cannot say the ALJ's findings do not meet the substantial evidence test.

### III.

We first address the 90–day suspension.[6] Under the APA Hutto could be suspended as a registrant under the Act "only if, before the institution of agency proceedings therefor, [it] has been given—(1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C.A. § 558(c) (West 1977). However, this pre-suspension notice is not required if Hutto willfully violated the Act. *Id.*

### A.

■ Hutto contends that it was not given notice of the facts or conduct warranting suspension as required by section 558(c) of the APA. It concedes that during the 1960's and 1970's USDA issued several written warnings concerning possible improper weighing and record-keeping practices at the Holly Hill location. Although USDA argues that these warnings constituted sufficient notice, the last warning was given in 1976, more than a decade before the instant violations. Also, USDA inspected Hutto's Holly Hill location in 1982 and found that Hutto was employing proper weighing procedures. We therefore conclude that, under the circumstances here, the outdated warning letters do not constitute the notice envisioned and required by section 558(c).[7]

### B.

■ Thus, under the APA the suspension of Hutto was not proper unless it willfully violated the Act. We note initially that the Supreme Court has held that nothing in 7 U.S.C.A. § 204 (West 1980), authorizing suspensions under the Act, "confines its application to cases of 'intentional and flagrant conduct' or denies its application in cases of negligent or careless violations." *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 187, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973). *Glover*, however, concerned the level of conduct necessary to warrant suspension under the Packers and Stockyards Act in a case in which the notice requirement of section 558(c) of the APA had been satisfied. Here, by contrast, the notice requirement was not satisfied and consequently the conduct must rise to the level of willfulness required to justify suspension under section 558(c) of the APA. We agree with the Tenth Circuit that, in the context of a suspension under the Packers and Stockyards Act, "willfulness" for purposes of section 558(c) means "an intentional misdeed or such gross neglect of a known duty as to be the equivalent thereof." *Capitol Packing Co. v. United States*, 350 F.2d 67, 78–79 (10th Cir.1965). A less stringent definition may collide with the requirements of administrative due process and would betray the plain meaning of the word.

■ Notwithstanding the specific finding of the ALJ that there was no evidence to support a finding of willfulness, the JO "inferred" that Hutto's acts were intentional.[8] His inference was derived from the frail premises that prematurely inserting the scale ticket in the poise "necessarily

---

**6.** Although both the order of the ALJ and the order of the JO suspended Hutto Stockyard and John and Charles Hutto as registrants under the Act, USDA notes in its brief that only Hutto Stockyard could actually be suspended because only it was registered under the Act.

**7.** Nor are we persuaded by the strained contention of USDA that notice should be imputed to Hutto because it once acknowledged on a form that it had read "Packers and Stockyards Scales and Weighing Memorandum No. 3," which mentions the regulations pertaining to weighing and record keeping.

**8.** The JO attached his 37–page "USDA Sanction Policy" as an appendix to the 69–page order. This appendix pontificates on the nature and goals of punishment and champions the deterrent effects of the severe sanction policy of the USDA. The didactic and punitive tone of the appendix is punctuated with quotations from Nietzsche, Plato, Socrates, and the Bible, as well as several contemporary philosophers. Significantly, the JO admits in the appendix that: "Frequently, *I infer that certain conduct was intentional and done with knowledge of unlawfulness (for the benefit of reviewing judges who may*

results in shortweighing" and that the weighmaster closed the trig loop latch when the needle was above rather than in the target area. Although stating that existence of a motive to short-weigh is irrelevant for purposes of determining whether conduct is intentional, the JO speculated that by short-weighing Hutto could receive a better price from packers who would have obtained more favorable yields due to the short-weighing. In addition, the JO ventured that perhaps Hutto was offering to pay more per pound than competing hog buyers and thus was luring sellers from surrounding markets. The record is barren of any evidence, direct or indirect, to support these unwarranted speculative theories. We specifically reject them as totally unconfirmed by the record or the reality of the marketplace. Furthermore, the ALJ specifically found that "[t]here is no evidence that [Hutto] received financial gain or improved standing with buyers or sellers as a result of alleged misweighing." Indeed, if Hutto had wished to benefit financially by deceptive weighing, it logically would have weighed the hogs artificially high, for the amount of profit it realized increased proportionally by the weight attributed to the hogs at the time it purchased them, for this same weight was the basis on which packers paid Hutto. There was no economic incentive to short-weigh and while short-weighing resulted in a loss to the sellers, it likewise resulted in a loss to Hutto.

We hold that the JO's "inference" that Hutto intentionally violated the Act is not supported by substantial evidence. Therefore, because Hutto did not receive reasonable notice, the 90–day suspension is set aside for failure to comply with the requirements of the APA.

### IV.

The JO affirmed the ALJ's order fining Hutto $20,000. In support of the imposition of this fine, USDA contends that Hutto committed six separate violations of the Act: five violations of 7 U.S.C.A. § 213(a) (engaging in false and deceptive weighing practices) and one violation of 7 U.S.C.A. § 221 (failing to maintain proper recordkeeping procedures).

### A.

■■■ Decisions of the Secretary may be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1977). 7 U.S.C.A. § 213(b) requires the Secretary, before assessing monetary penalties for a violation of section 213(a), to consider (1) the gravity of the offense, (2) the size of the business involved, and (3) the effect of the penalty on the person's ability to continue in business. *See Spencer Livestock Comm'n Co. v. Department of Agric.*, 841 F.2d 1451, 1457 (9th Cir.1988); *Bosma v. United States Dep't of Agric.*, 754 F.2d 804, 810 (9th Cir.1984). As the proponent of the penalty, USDA bears the burden of producing evidence that the penalty was reasonable. 5 U.S.C.A. § 556(d) (West 1977); *Bosma*, 754 F.2d at 810. While the record shows that the ALJ and the JO gave some consideration to the first factor, the gravity of the offense, before assessing the $20,000 penalty,[9] USDA conceded at oral argument that the record demonstrates that neither the ALJ nor the JO explicitly considered the second and third factors. Indeed, a strained reading of the record does not allow a conclusion that even indirect consid-

*dislike my hard-nosed sanction policy* )." (Emphasis added.)

The JO's self-described policy of reflexively inferring intentional conduct belies any contention that his finding on this issue is supported by substantial evidence. In fact, as the Sixth Circuit observed while reviewing a decision of this same JO, there has been a "near approach" to a breach of the line between judging and prosecuting. *Parchman v. United States Dep't of Agric.*, 852 F.2d 858, 866 (6th Cir.1988) (reviewing JO's decision and finding "disturbing instances of what may appear to be a punitive

mentality overriding individual considerations").

9. Neither the method used by the ALJ and the JO in calculating this penalty nor the amount of the penalty respectively attributable to the violations of sections 213(a) and 221 are found in the record. Furthermore, two important factors should have been given paramount consideration when assessing the gravity of the offense—that no willful or intentional misconduct was involved and that no financial gain or other advantage accrued to Hutto.

eration was given to these two other equally important factors. Consideration of all three factors is mandated by statute and is far from a technical requirement. The need for full consideration of these equally important factors is vividly demonstrated here since the penalty imposed is almost three times the amount of the 1986 net profit of Hutto Stockyard. Thus, on the basis that it was imposed "not in accordance with law" since the Secretary failed to comply with the statutory requirements, we vacate and remand for reconsideration of the imposition of the section 213(b) monetary penalty.

In addition to failing to consider all of the statutory factors, the fine imposed exceeds the statutory maximum. USDA contends that Hutto committed five separate violations of section 213(a): failing to balance the empty scale every 15 minutes or 15 drafts, back-balancing the scale, closing the trig loop latch when the indicator needle was above rather than in the target area, inserting the scale ticket in the poise before weighing, and allowing material to accumulate in the poise. Yet it is unclear from the record, the opinion of the ALJ, or the opinion of the JO how many acts Hutto was actually found to have committed to support the finding of a violation of section 213(a); it is clear, however, that whatever acts were relied upon all occurred contemporaneously.

Section 213(a) prohibits the use of "any unfair . . . or deceptive practice or device in connection with . . . [the] weighing . . . of livestock." False weighing is an unfair or deceptive practice under the Act. However, the methods by which a stockyard operator allegedly causes false weighing— whether it is back-balancing or not discovering that a mouse has entered and died in the poise—although violative of the regulations, are not in themselves unfair or deceptive practices supporting separate violations of section 213(a). Rather, they are evidence that an unfair and deceptive practice of false weighing may have occurred. To hold otherwise would allow an operator to be successively penalized under section 213 for what is actually only one violation. *Cf. Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (when crimi-

nal statute ambiguous as to whether simultaneous transportation of more than one person in violation of the Mann Act exposed defendant to cumulative punishment, doubt resolved against turning single transaction into multiple offenses).

We see no reasonable basis for finding that Hutto committed more than one unfair or deceptive "practice" of false weighing. "Practice" within the context of section 213 means " 'uniformity and continuity, and does not denote a few isolated acts.' " *Guenther v. Morehead*, 272 F.Supp. 721, 727 (S.D.Iowa 1967) (quoting *McClure v. E.A. Blackshere Co.*, 231 F.Supp. 678, 682 (D.Md.1964)); *see also Capitol Packing*, 350 F.2d at 77 (to find violation of section 213(a), "a specified manner of dealing must be found to be unfair or deceptive"). The conduct USDA complains of here occurred during a few hours of a single day. Accordingly, we hold that the facts of this case support a finding of only one violation of section 213(a).

### B.

■ The ALJ also found that Hutto violated 7 U.S.C.A. § 221 by issuing improperly completed scale tickets. Specifically, he found that the scale tickets did not show the date of weighing, the weighmaster's initials or name and listed Hutto's Holly Hill rather than Manning location. *See* 9 C.F.R. § 201.49(a) (1989). Section 221, the statutory analog to 9 C.F.R. § 201.49, requires a stockyard owner to "keep such accounts, records, and memoranda as fully and correctly disclose all transactions involved in his business." 7 U.S.C.A. § 221. This section further provides that if the Secretary finds that the accounts, records, and memoranda of a stockyard owner do not fully and correctly disclose all transactions involved in his business, the Secretary may prescribe the manner and form in which such materials are to be kept. Thereafter, the stockyard owner who fails to keep such material in the prescribed manner and form "shall upon conviction be fined not more than $5,000, or imprisoned not more than three years, or both." 7 U.S.C.A. § 221.

We hold that section 221 is inapplicable here. First, the section requires that the

stockyard owner be notified by the Secretary that his method of keeping accounts, records, and memoranda is inappropriate. The only notification Hutto received concerning record-keeping practices was contained in the outdated warning letters discussed earlier. For the same reasons that Hutto was not given proper pre-suspension notice under the APA, we hold that it was not given proper notice pursuant to section 221.

Second, since application of the regulation to Hutto was a final agency action, it may be set aside only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S. C.A. § 706(2)(A). "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (citations omitted). Applying this standard of review, we are "required to make a careful inquiry to determine the reasonableness of the administrative interpretation and application of the regulation." *Phelps Dodge Corp. v. Federal Mine Safety and Health Review Comm'n*, 681 F.2d 1189, 1192 (9th Cir.1982). In *Phelps* the Ninth Circuit reversed an order of the Federal Mine Safety and Health Review Commission fining Phelps for allegedly violating a mine safety regulation. The regulation at issue mandated that "[e]lectrically powered equipment shall be deenergized before mechanical work is done on such equipment. Power switches shall be locked out or other measures taken which shall prevent the equipment from being energized without the knowledge of the individuals working on it." *Id.* at 1191 n. 1. Two Phelps employees were standing on a "panfeeder" cleaning out a rock-clogged drop chute when an agency inspector arrived. The employees often used the panfeeder to jostle the rocks and move

loose stones. Because they were cleaning out the chute and the panfeeder was electrically powered, the employees were engaged in "mechanical work" on "electrically powered equipment." Although the Phelps employees had turned off the electrical power to the panfeeder at a nearby control box, they had not "locked out" the panfeeder by flipping a power switch in a distant control room. The agency inspector issued an order and fine based on the failure to "lock out" the panfeeder.

On judicial review Phelps contended that "the regulation has been incorrectly applied in this case because its basic purpose, fairly read, is to protect workers from the hazards of electrical shock, not such hazards as may attend removal of rocks from the chute." *Id.* at 1192. The Ninth Circuit held that the Secretary abused his discretion by applying the regulation to the facts of the case because "[t]he regulation inadequately expresses an intention to reach the activities to which [the agency] applied it." *Id.* at 1193. The court was persuaded that the regulation was only intended to protect workers from injuries caused by electric shock and, if a different intent existed, fair warning of the reach of the regulation had not been given.

The rationale of *Phelps* applies a fortiori here because, as USDA acknowledged, section 201.49 is intended to protect a seller whose animal is weighed but not immediately purchased and the seller and animal are separated for several hours or more between the weighing and purchase. Here, after each weighing, the seller was paid immediately for the hog(s) according to the weight determined in the seller's presence.[10] Indeed, USDA conceded at oral argument that enforcement of section 201.49 under these facts would serve no rational purpose and remedy no harm since other documents which Hutto gave to the sellers provided all the information required by the regulation. We hold that enforcement of the regulation under these facts is unreasonable and amounts to an abuse of discretion. Accordingly, we reverse the finding of the Secretary that Hutto violated section 221.

---

**10.** USDA cites as evidence of this violation the fact that the ticket given to the seller immediate-

ly after weighing listed the site of the weighing as Holly Hill rather than Manning. This argu-

## V.

In conclusion, we vacate the suspension order and vacate and remand the monetary penalty. On remand the Secretary is instructed to consider, in accordance with 7 U.S.C.A. § 213(b), the fact that this violation was not committed willfully, the size of Hutto's business and the effect of the proposed penalty on Hutto's ability to continue in business. Additionally, we hold that on remand Hutto may only be sanctioned for one violation of section 213(a). We also reverse the finding of the Secretary that Hutto violated section 221. We affirm the cease and desist order.

AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; AND REMANDED WITH INSTRUCTIONS.

ment illustrates the position in which USDA's overbearing approach has placed it, for no one can seriously believe that a seller who has transported his hog to the Manning location will be persuaded that he actually drove to Holly Hill because his ticket listed the Holly Hill location and is thus somehow unfairly treated.