Robert E. PARCHMAN; Virgil R. (Ray) Lemons; Jack E. Hamilton, Petitioners,

v.

## UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.

No. 87–3701.

United States Court of Appeals, Sixth Circuit.

Argued March 7, 1988.

Decided July 22, 1988.

Rehearing Denied Sept. 27, 1988.

Gerald D. Eftink (argued), Daniel W. Olsen, Van Hooser, Olsen & Parkinson, P.C., Kansas City, Mo., for petitioners.

Edward Silverstein, Office of General Counsel, U.S. Dept. of Agriculture, Washington, D.C., Aaron B. Kahn (argued), for respondent.

Before KRUPANSKY and BOGGS, Circuit Judges, and BROWN, Senior Circuit Judge.

BOGGS, Circuit Judge.

Robert Parchman, Virgil (Ray) Lemons and Jack Hamilton (the stockyard operators) are partners. They operate stockyards in Cumberland City, Tennessee and Paris, Tennessee. Their business is to weigh livestock and sell the animals on behalf of their owners at public auction. Although the buyers and sellers of livestock transact business on the basis of the animals' weight, the stockyard operators receive a set commission of $7.00 a head for their services.

On May 28, 1987, the Judicial Officer for the Department of Agriculture (JO)[1] upheld the decision of an administrative law judge (ALJ) that the stockyard operators willfully violated statutory and regulatory provisions of the Packers and Stockyards Act, 1921, 7 U.S.C. §§ 181–229 (1982) (the Act), based on the determination that, *inter alia,* the stockyard operators "deliberately weighed animals at less than their true and correct weights with full knowledge that this was prohibited by the Act and the regulations."[2] The JO adopted the ALJ's findings, decision and order, including the ALJ's proposed sanction with modifications that are minor and irrelevant to this proceeding. That sanction suspended the stockyard operators' registration under the Act for 90 days and assessed a civil penalty in the amount of $10,000.[3]

On petition for review of this order, the stockyard operators do not challenge the findings that they violated the Act. Rather, they contest the determination that their violations were willfully committed. They contend that the weighing errors were the result of a mechanical malfunction in their scale and, therefore, that they did not have a scienter sufficient to merit the severity of the sanctions imposed. The stockyard operators also contend that they were deprived of due process during the administrative proceedings because the ALJ refused to allow into evidence a photograph of their scale and because the JO's well-known views favoring severe sanctions as a deterrent[4] "mean[s] that severe sanctions will issue regardless of whether there is willful conduct."

For the reasons that follow, we reverse the findings that the stockyard operators weighed livestock "at less than their true

1. The Agriculture Department's JO has been designated by the Secretary of Agriculture as the final decisionmaker in adjudicatory proceedings brought to enforce the department's various regulatory programs. See 7 C.F.R. § 2.35 (1986). "The JO, sitting in review of an ALJ's initial decision, is authorized by statute 'to substitute its [sic] judgment for that of the ALJ.'" *Farrow v. United States Dep't of Agric.,* 760 F.2d 211, 213 (8th Cir.1985) (quoting *Mattes v. United States,* 721 F.2d 1125, 1129 (7th Cir.1983)).

2. The complaint filed against the stockyard operators by the Packers and Stockyards Administration charged that they:
 (1) Weighed such consigned livestock at less than their true and correct weights;
 (2) Issued scale tickets and accounts of sale to the consignors of such livestock on the basis of false weights;
 (3) Paid the consignors of such livestock on the basis of the false weights;
 (4) Issued buyer invoices and scale tickets to the purchasers of such livestock on the basis of the false weights;

 (5) Collected the purchase prices from the purchasers of the livestock on the basis of the false weights; and
 (6) Issued scale tickets which failed to show the time of balance or the address of the market, and which were not initialled by the weighmaster.

 On the basis of these charges, the operators were found in violation of 7 U.S.C. §§ 205, 208, 213(a), 221 and of 9 C.F.R. §§ 201.43, 201.49, 201.55, 201.71, 201.73, 201.73–1 (1986).

3. Although the violations petitioners are charged with stem from their Cumberland City operation, their Paris operation also is affected by the 90–day suspension.

4. *See, e.g. Garver v. United States,* 846 F.2d 1029 (6th Cir.1988) (livestock dealer suspended for two years attacked his sanction on the ground that past writings of the same JO, in which he "opined at some length about the usefulness of severe sanctions as a deterrent," evidenced disqualifying personal bias).

and correct weights," and that the violations were willfully committed, on the ground that substantial evidence does not exist in the record to support these findings. However, the record does contain substantial evidence that the stockyard operators were not complying with the Act and, accordingly, we affirm the findings of the statutory and regulatory violations.

Because the stockyard operators had been given written notice that they were not operating in accordance with the Act and could be suspended if future violations were discovered, a finding of willfulness is not necessary to support the proposed suspension of their registration. 5 U.S.C. § 558(c) (1982).[5] While we are disturbed by the intemperate tone of parts of the JO's decision and order and have given the charge of biased adjudication the attention that this most serious allegation deserves, we conclude that evidence of disqualifying bias is not present in this record.

Our review of the administrative proceedings indicates that the stockyard operators were afforded due process and that the determinations made, apart from the exceptions noted, are supported by substantial evidence. Thus, the proposed sanction is upheld.

I

On February 26, 1986, a hearing was held before an ALJ on the charges brought against the stockyard operators. At the hearing, an employee from the Packers and Stockyards Administration, Jimmy Thompson, testified that on August 11, 1984, he and another agency employee went to the Cumberland City Stockyard to conduct a routine "checkweighing" investigation. According to Thompson, "[c]heckweighing is a procedure that we [the Packers and Stockyards Administration] use to determine if the weighmaster is weighing accurately or not." A check-weigh does not

determine the accuracy of a scale, but only if the scale appears to be operated properly by the stockyard. Thompson further explained that

[a]t a check-weighing investigation, we will determine which market we are going to check-weigh. We will arrive at that market unannounced. In the case of an in-weigh market, or in the case where livestock is weighed before it is sold, we will go directly to the scale and announce ourselves to the weighmaster or the people that are near the scale. We will then check the balance on the scale and tell them our purpose or the reason for our visit.

Thompson added that if a scale is being operated properly, the scale, upon reweighing of an animal, "should have reweighed the same animal at the same amount or less [than it was] ... weighed [at] ... the first time."

On August 11, 1984, Thompson checked the Cumberland City Stockyard scale while the other agency employee and Robert Parchman selected some livestock to be reweighed. Thompson testified that he did not see anything binding on the scale or any other obvious impairment, that "everything looked proper" and that he "obtained a good zero balance on the scale" before the livestock were reweighed.

The result of the August 1984 checkweigh was that 11 animals were reweighed as having weights 5 to 15 pounds higher than the weights recorded by the stockyard weighmaster on the first weighing. Thompson testified that it would be virtually impossible for the animals to have gained weight during the interval between weighings because they had been held in a pen without food or water. He also stated that a five-pound discrepancy between scale readings was not an unusual occurrence since the viewing position of the

5. Section 558(c) of the Administrative Procedure Act, 5 U.S.C. § 558(c), states:

Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency

proceedings therefor, the licensee has been given—

(1) notice by the agency in writing of the facts or conduct which may warrant the action; and

(2) opportunity to demonstrate or achieve compliance with all lawful requirements.

weighmaster can affect how the scale is read.

Thompson also testified that the August 1984 investigation revealed that the scale tickets used at the stockyard did not comport with the Act's regulations because they failed to indicate the address of the market or the time when the scale had been zero balanced, and the weighmaster had not initialed some of the tickets prepared that day.

On August 21, 1984, the Regional Supervisor of the Packers and Stockyards Administration wrote Robert Parchman stating,

Our investigation [on August 11, 1984] revealed that the calves were not weighed accurately. These weight discrepancies were discussed with you at that time.

As you are aware, weighing livestock inaccurately is a violation of the Packers and Stockyards Act. That Act makes you responsible for accurately weighing livestock consigned to your market for sale. We request that you review the enclosed instructions for weighing livestock with your weighmaster and take the necessary action to insure accurate weights. Please advise this office within 15 days [of] what action you have taken to improve your weighing practices.

If similar discrepancies are found in the future, it may be necessary to initiate administrative proceedings which could lead to suspension of your registration under the Packers and Stockyards Act.

Nine months later, on May 18, 1985, Thompson and David Moss, an inspector of large scales employed by the Tennessee Department of Agriculture, conducted another checkweighing investigation at the Cumberland City Stockyard. Thompson stated that before they began the reweighing process and as they were checking the balance on the scale, Ray Lemons, the weighmaster that day, informed them that he believed a part of the scale was dragging on the ground. Thompson testified, however, that he did not observe any problem with the scale.

The check-weigh was conducted and again the animals that were reweighed did not have food or water between the weighings. Thompson testified that the scale zero balanced before and during the reweighing process and that the reweighing indicated higher weights for the animals than the weights initially recorded by the stockyard weighmaster. The discrepancies discovered on May 18, 1985, ranged from 5 to 55 pounds, with the majority being 20 to 25 pounds apart.

The May 1985 investigation also revealed that the stockyard's scale tickets did not indicate when the zero balance had been checked or the address of the market. Stockyard records, known as "pen sheets" or "buyer's bills" were copied during the investigation and indicated that livestock had been bought and sold on the basis of the weights originally recorded by the stockyard.

Moss, the state inspector, testified that he had inspected the scale at the Cumberland City Stockyard 11 days earlier, on May 7, 1985. Unlike a check-weigh performed by the Packers and Stockyards Administration, Moss's inspection does determine how accurately the scale weighs objects. According to Moss, the May 7, 1985, inspection revealed that the scale was underweighing by 5 or 6 pounds. Moss stated that he adjusted the scale so that it was operating at an acceptable level of accuracy.

Terry Lemons, an employee of the stockyard operators, testified at the hearing that he initially weighed the cattle that were later reweighed on August 11, 1984. Terry Lemons admitted that there was a period of 45 minutes to an hour that day during which he was busy and "got lax in checking my [zero] balance." He also stated that it was not uncommon for animals to knock part of the scale loose and that the part would then drag on the ground while an animal was weighed. Terry Lemons indicated that he believed the dragging scale part caused the weight discrepancies.

Ray Lemons also testified at the hearing. During his testimony he admitted that the

stockyard used scale tickets which did not conform with the Act's regulations.

After all the evidence was submitted, the ALJ, disregarding weight discrepancies of five pounds because that spread is "[n]ot unusual," concluded that on August 11, 1984, 9 head of cattle, and on May 18, 1985, 20 head of cattle, were weighed "at less than their true and correct weights." The ALJ also found that the weighmaster had not recorded the time when the scale was zero balanced on the scale tickets, that the tickets did not show the address of the market and that the weighmaster failed to initial some scale tickets, all in violation of the Act's regulations. The ALJ determined that the operators had willfully committed the violations because they

> were well aware of the necessity to maintain and properly operate the scale, specifically, through knowledge of the "Instructions for Weighing Livestock[,"] discussion of violations with Packers and Stockyards investigators, and acknowledgement of the latter's letter to respondents, dated August 21, 1984, which admonished respondents "to take the necessary action to insure accurate weights."

On July 21, 1986, the operators appealed the ALJ's decision to the JO, Donald Campbell. The operators requested oral argument, which is discretionary under the regulations. 7 C.F.R. § 1.145(d). Campbell denied the request stating, "inasmuch as the issues are not novel or difficult, the case has been thoroughly briefed, and oral argument would seem to serve no useful purpose."

Campbell adopted the ALJ's decision and order although he made a few minor changes and added a substantial discussion addressing his own view of the evidence and the propriety of the ALJ's proposed sanction.[6] Although he affirmed the find-

ing that the violations were willfully committed, Campbell stated that it was irrelevant in this case whether the violations were willful or not. He noted that the August 21, 1984, letter from the Regional Supervisor warned the stockyard operators that future noncompliance with the Act could lead to suspension of their registration. Thus, the suspension of the stockyard operators' registration was authorized by section 558(c) of the Administrative Procedure Act. Campbell concluded that the sanction of a suspension and civil penalty "is in accordance with the announced policy of the Department and is determined to be appropriate under the circumstances."

## II

The findings of the JO on behalf of the Secretary of Agriculture must be affirmed if supported by substantial evidence in the record. *Blackfoot Livestock Comm'n v. Dep't. of Agric.*, 810 F.2d 916, 920 (9th Cir.1987); *Farrow*, 760 F.2d at 213; *Mattes*, 721 F.2d at 1128-29. Substantial evidence " 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). If substantial evidence supports a finding that the Act or regulations were violated, the Secretary is given broad discretion to determine the appropriate sanction. *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 187-88, 93 S.Ct. 1455, 1458-59, 36 L.Ed.2d 142 (1973); *accord Blackfoot Livestock*, 810 F.2d at 922.

Because livestock are traded on the basis of weight, a stockyard which does not provide an accurate determination of an ani-

---

**6.** One change Campbell made was to add an appendix in which he reproduces an excerpt from an earlier decision of his, *In re Spencer Livestock Comm'n Co.*, 46 Agric. Dec. —, slip op. (Mar. 19, 1987), *aff'd*, 841 F.2d 1451 (9th Cir.1988), which discusses the sanction policy of the Department of Agriculture and explains that the policy is designed to promote deterrence. In the excerpt, Campbell quotes various authorities on the subject of punishment, including

Plato, Socrates, Nietzsche and the Bible. For example, he emphasizes the deterrent effect severe punishment of one violator can have on potential violators by quoting the following passage from the Bible:

> You shall stone him to death with stones.... And all Israel shall hear, and fear, and never again do any such wickedness as this among you.

Deuteronomy 13:10-11.

mal's weight can have adverse effects upon the market. Thus, Congress has authorized the Secretary to regulate the stockyard industry in an effort to have fair and nondiscriminatory markets. As another appellate court has noted, "[t]he Packers and Stockyards Act does not require that the Secretary prove actual injury before a practice may be found unfair.... [T]he Secretary need only establish the likelihood that an arrangement will result in competitive injury to establish a violation." *Farrow*, 760 F.2d at 215.

 The Secretary has determined, based on the results of the check-weighs performed on August 11, 1984, and on May 18, 1985, that the stockyard operators weighed livestock *"at less than their true and correct weights"* (emphasis supplied). While we find the weight discrepancies to be substantial evidence that the stockyard was not providing "accurate" and "actual" weights of the livestock traded there, the fact that the livestock weighed more upon reweighing is not *per se* evidence that the second weight was the correct weight and, therefore, that the stockyard operators were indeed weighing livestock "at less than their true and correct weights." The record is devoid of any evidence which indicates what the "true and correct weight" was for the animals reweighed on August 11, 1984, and May 18, 1985. The Packers and Stockyards Administration admits that a check-weigh is not designed to determine the accuracy of a scale. Although the fact that the animals had been held without food or water between weighings and weighed more upon reweighing lends credence to the conclusion that the first weighing of the livestock did not yield their actual weights, that fact alone does not suffice as substantial evidence that the second, higher weights were the correct weights of the animals. Accordingly, the results of the check-weighs, while substantial evidence that the stockyard was not being run in accordance with the Act's weighing procedures, do not qualify as substantial evidence that the stockyard operators weighed livestock "at less than their true and correct weights." Thus, this finding is not sustained.

 The weight discrepancies discovered on August 11, 1984, and May 18, 1985, support the determinations that 7 U.S.C. §§ 205, 208, 213(a) and 221 were violated by the stockyard operators because these statutory provisions prohibit the use of "unfair" or "deceptive" practices by a stockyard in connection with the purchase and sale of livestock and require that the Secretary's regulations be complied with. Although there is no evidence in the record that the stockyard operators intentionally set out to deceive or cheat any individuals patronizing the stockyard, nothing in the Act requires proof of a particular scienter before a violation of the statute may be found. The harm Congress has authorized the Secretary to prevent is the harm that has been proven here, purchases and sales of livestock on the basis of weights which are "deceptive" because it has been shown that they are inaccurate.

For similar reasons, the findings that the stockyard operators violated 9 C.F.R. §§ 201.43, 201.49, 201.71, 201.73 and 201.-73–1 are supported by substantial evidence in the record. These regulations require that "accurate" and "true" weights be taken and that the stockyard be operated in accordance with the Secretary's regulations. The weight discrepancies are substantial evidence that the weights recorded by the stockyard were not "accurate" and "true." In addition, Terry and Ray Lemons admitted that they were not operating the scale in compliance with the regulations. Accordingly, these findings, too, are sustained.

 We do not sustain, however, the determination that the stockyard operators willfully violated the Act. We are cognizant of the fact that the "breadth of discretion" Congress has given the Secretary to determine appropriate sanctions, authorizes the Secretary "to employ that sanction as in his judgment best serves to deter violations and achieve the objectives of [the] statute." *Butz v. Glover Livestock*, 411 U.S. at 187–88, 93 S.Ct. at 1459. Moreover, like the Eighth Circuit, we acknowledge that nothing in 7 U.S.C. § 204, which authorizes suspensions, " 'confines its applications to cases of "intentional and flagrant

misconduct" or denies its application in cases of negligent or careless violations.' " *Farrow*, 760 F.2d at 216 (quoting *Butz v. Glover Livestock*, 411 U.S. at 187, 93 S.Ct. at 1458).

Section 558(c) of the Administrative Procedure Act, 5 U.S.C. § 558(c), does limit the Secretary's discretion, however. *See Capitol Packing Co. v. United States*, 350 F.2d 67, 78 (10th Cir.1965). The Secretary admits in his brief that section 558(c) limits his authority to suspend registrations under the Act absent a finding of willfulness. He argues that the JO was correct in his "alternative holding" that "willfulness is not an issue in this case" because the August 21, 1984, letter to the stockyard operators, which warned that future noncompliance could result in a suspension of their registration under the Act, satisfies the demands of section 558(c).

■ We agree that the JO's "alternative holding" is correct. Section 558(c) requires that, unless an agency licensee has willfully violated a "lawful requirement" or has endangered "public health, interest, or safety," the licensee must be given written notice "of the facts or conduct which may warrant ... [suspension]; and ... opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c). Certainly by the time of the May 18, 1985, check-weigh, the stockyard operators had been notified that they had not operated in accordance with the Act in the past, but this fact does not mean that substantial evidence exists to uphold the conclusion that they were operating with other than a good faith intent to comply with the Act at the time of both check-weighs.

Yet while the determination that the violations were willful is not supported by the record, such a finding is unnecessary to uphold the suspension. As the JO concluded, the August 21, 1984, letter from the

Regional Supervisor of the Packers and Stockyards Administration put the stockyard operators on notice that they were not in compliance with the Act and gave them an opportunity to comply. Regardless of what may have caused the weight discrepancies, it was the stockyard operators' responsibility to insure that their scale was functioning properly and that stockyard procedures conformed to the Act's requirements. The results of the May 18, 1985, check-weigh support the JO's determination that compliance was not achieved after this notice and opportunity was provided. Accordingly, the suspension comports with the requirements of section 558(c) and, therefore, is sustained.[7]

### III

■ The stockyard operators contend that they were deprived of due process during the administrative proceedings because both the ALJ and the JO refused to allow them to enter into evidence photographs of the part of the scale they claimed caused the weight discrepancies. The regulations allow evidence to be excluded if it "is immaterial, irrelevant, or unduly repetitious, or ... is not of the sort upon which responsible persons are accustomed to rely." 7 C.F.R. § 1.141(g)(1)(iv).

The ALJ excluded the photographs stating, "I really can't tell what they are. I mean, there is no relation to the whole scale, and there are no other pictures orienting or designating where this spot is. It could be any scale any place. There is no identification that this is the scale at Cumberland City." Terry Lemons testified at the hearing that the photographs were taken after the May 18, 1985, check-weigh. Thus, the facts indicate that the photos arguably were irrelevant to the issues presented at the hearing. Moreover, the stockyard operators have not demonstrated

---

**7.** The stockyard operators also have challenged the severity of the civil penalty part of their sanction. The amount of the penalty is sustained for, as we stated recently in a similar challenge to a sanction under the Act,

> [t]his court does not review administrative agency sanctions for reasonableness, or for whether they comport with our ideas of justice. The Supreme Court clearly held in *Butz v. Glover Livestock [Comm'n] Co.*, 411 U.S.

182, 187–88, 93 S.Ct. 1455, 1458–59, 36 L.Ed.2d 142 (1973), that those determinations are for the agency:

> . . . .
>
> The sanction ... [is] among those permitted by the authorizing statute and the departmental regulation, and the statute and regulation themselves are not challenged.

*Garver*, 1030 (quotation omitted).

how they were prejudiced by the failure to have the photographs admitted. Both the ALJ and the JO considered their argument that the scale was malfunctioning. Under these circumstances, we conclude that the refusal to admit this evidence did not deprive the stockyard operators of due process.

The stockyard operators also charge that they were deprived of due process because of JO Campbell's "institutional 'bias' ... that tends to result in the USDA ruling in its favor in these cases, regardless of the people involved," and because of his well-known and strongly held views in favor of severe punishment in order to foster deterrence.

While we recognize that the discretion afforded to the administrative officer under *Butz* is very large, and is here upheld, we do note disturbing instances of what may appear to be a punitive mentality overriding individual considerations.[8] As this court noted in *Garver*, a judge's decisions are not biased simply because the judge has a particular view of the law. *Garver*, 1031 (citing *First Nat'l Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1337 (6th Cir.1987) (collecting cases)). Also, as was the case in *Garver*, "there is no indication whatsoever that Campbell did not function in a judicial capacity, or that he entertained preconceived notions as to a sanction in this particular case." *Id.* at 1031.

Nevertheless, a judge should be careful not to give the impression that a particular view of the law prevents a careful consideration of the law and facts applicable to any given case. When an entire career has been spent in the service of one governmental agency[9], it can be easy for a judge to slip into a stance that may appear to be advocating, rather than judging,

those interests. We do not believe that such a line has been crossed in this case, but we note that it may appear to reasonable observers that there has been a near approach to it.

## IV

We have considered the stockyard operators' challenge to the Secretary's order and have concluded that not all of the Secretary's determinations are supported by substantial evidence in the record when viewed as a whole. Nonetheless, for the reasons stated above, the Secretary's order, including the suspension of the stockyard operators' registration under the Act for a period of 90 days, is affirmed.

---

8. For example, in the appendix to his decision in this case, the JO states, "Frequently, I infer that certain conduct was intentional and done with knowledge of unlawfulness (for the benefit of reviewing judges who may dislike my hard-nosed sanction), ... but the sanction would be the same irrespective of those circumstances."

9. Campbell obtained his law degree from the George Washington University Law Center in 1949. He was appointed JO in January 1971

after, in his own words, "having been involved with the Department's regulatory programs since 1949 (including 3 years' trial litigation; 10 years' appellate litigation relating to appeals from the decisions of the prior Judicial Officer; and 8 years as administrator of the Packers and Stockyards Act regulatory program) (December 1962–January 1971)." *See In re Parchman*, 46 A.D. ——, P. & S. No. 6602 slip op. at 1a n. **; 1987 Federal Staff Directory at 906.